## *In re* HALL'S WILL.

*(Surrogate's Court, New York County, Filed July, 1893.)*

1. WILL—KNOWLEDGE OF CONTENTS.

    When the execution of a will has been proved, the presumption is raised that testatrix knew its contents.

2. SAME.

    In such case, however, if there is evidence of fraud and undue influence, affirmative proof of knowledge by testatrix of the contents becomes necessary.

3. SAME.

    When the evidence shows that five days before the execution of her will the testatrix heard it read to her, and that at the time of execution she declared in the presence of witnesses that she knew its contents, and that at the time of such execution she was of sound mind—*held*, that this constituted affirmative proof that testatrix had knowledge of the contents of the will.

4. SAME—MENTAL CAPACITY AT EXECUTION.

    If when testatrix executed her will, she fully comprehended the business she was about to transact, and had in view the nature and extent of her possessions, and knew those who had claims upon her bounty, and acted of her own free will, it is immaterial that about eight days previously she had recovered from a stupor which the doctor pronounced coma, and which had lasted a few days.

Probate of will.    Granted.

D. McLean Shaw and Mellen & Devernay, for proponent; Hornblower, Byrne & Taylor, for contestants.

FITZGERALD, S.—The paper propounded as the will of the decedent, Mrs. Lisinka Hall, was executed in the evening of December 20, 1892. By it she bequeathed $1,000 and a gold watch belonging to her late husband to her nephew William L. Hall, and $1,000 to be expended by her executor for a window in the Presbyterian church at North East, Pa., as a memorial of her late husband. She devised the house and lot No. 83 East Tenth street, in this city, to her nephew Elmer E. Ross, and directed that the residue of her estate be converted into money, and the proceeds be divided equally among her nieces Mrs. Loomis, Mrs. Buckle, Mrs. Force and Mrs. Ross. The legatees designated as nephews and nieces were not of kin to Mrs. Hall. They were a nephew and nieces of her husband, except Ross, who was the husband of one of the nieces. The paper names E. Van Ness Heermance, an attorney, sole executor, and revokes all former wills. The house and lot devised are leasehold property. An answer to the petition for probate was filed March 25, 1893, by Joseph C. Hurley and Mark W. Potter, the executors named, one in a will executed November 18, 1890, and both in a codicil thereto executed October 14, 1892. It alleges that the execution of the paper propounded was not the free, unconstrained and voluntary act of the decedent, and that she was at that time mentally incompetent to make a will. In the determination of the issues thus raised it is necessary to consider the testimony of persons present at the execution of the paper, the relation of the decedent to the various parties, her age, her personal characteristics, the condition and extent of her estate, her surroundings, and the probabilities of the paper representing her real wishes. The first witness examined was Benjamin F. Eberts, a subscribing witness. He states that on the evening of December 20, 1892, he and Theodore P. Bucher, another subscribing witness, were in the reception room of Mrs. Hall's house, No. 83 East Tenth street; that Heermance, the attorney,

came in about 9 o'clock, and a half hour after the third witness, Dr. Sheppard, who was Mrs. Hall's attending physician, arrived. He spoke to them, and then went to her apartnemt on the floor above. When he returned, Heermance went up, leaving the others in the reception room, in conversation, and on returning he asked them up. Eberts states that, when they entered the room, Mrs. Hall was in bed, with the will in her hand. That Bucher asked her if she thought she could write, and she said "Yes," she thought so, and worked her fingers as if in writing. That Dr. Sheppard asked her if the paper was her will, and she said "Yes." That Bucher dipped the pen in the ink. She took hold of it and started to write, but the pen was not satisfactory; and Bucher asked her if he could assist her, and she made an affirmative reply. That Bucher then took hold of her hand, and helped her to write her name, and when the signature was half completed she looked up, as if she wanted more ink, and Bucher filled the pen again, and assisted her to complete the signature. Heermance then asked her if the paper was her last will and testament, and if she desired Bucher, Dr. Sheppard, and Eberts as witnesses to the will, to which she responded, "Yes, I do," and then each signed the paper in her presence. Dr. Sheppard states that on the occasion he asked Mrs. Hall if the paper was her will, and he said he hoped it would be satisfactory to her, and she said, "Yes;" that, after it was signed by her, Heermance asked her if this was her last will and testament and if it was all right, and she said "Yes." Bucher testified that, when the three witnesses and Heermance reached Mrs. Hall's room, she had the will in her hand. He agrees with Eberts in his statement of the facts that occurred, and states, in addition, that he procured a small mirror, on which the will was placed, and that after she had completed her signature he asked her if the paper was her last will and testament, and if she knew its contents, to which she answered "Yes" to both questions; that Heermance then read some clauses of the paper, and in response to a question by him, if she desired them to sign as witnesses to her signature and seal, she answered,

"Yes." Each of the subscribing witnesses testify that Mrs. Hall was of sound mind, and that she acted without restraint. They did not, however, hear the will read to her, and it is apparent from their testimony that no word was used by her, except the affirmative expression, "Yes," in response to questions put to her, and which, under the law as declared by our courts, was a substantial compliance with the requirements of the statute of wills.

If, at the time of the execution of the paper, Mrs. Hall knew its contents, a clear, *prima facie* case has been made out, to sustain probate. But contestants' counsel claim that the testimony shows that Mrs. Hall had not at the time been told the contents of the paper, or, if she had, she did not have the mental capacity to execute a valid will. Under section 835 of the Code, Heermance was not a competent witness; but, as no objection was made to his testimony, he was examined. In determining the controversy, however, I shall give no consideration to his evidence in respect to any interview with the witness and decedent respecting instructions for, and advice given with reference to, the preparation of the will, or statements involving communications not made in presence of other witnesses.

To sustain the probate of a will, it must be shown to the satisfaction of the trial court, by direct proof, or as a legal inference from the evidence, that the testator was competent to make it, and knew its contents. There is abundant authority in the decisions of the courts, both in England and in this country, that in the case of a competent testator, where there are no circumstances showing want of good faith, it is not necessary to prove that the testator gave the instructions for the will, that he read it, that it was read to him, or that he was made acquainted with its contents at the time of execution. In Pettes v. Bingham, 10 N. H. 514, it was held that a testator is presumed to have knowledge of the will he has executed; and if it is alleged that he has not knowledge, or that he was induced to execute it by misrepresentation, the burden of proof is with those who make the objection. In Carr v. McCamm, 1 Dev. & B. 276, the court

held that under the law it was not incumbent on the proponent to produce other and distinct evidence that the testator knew the contents of the paper, above what presumptively arose from its formal execution. In Worthington v. Klemm, 144 Mass. 167, 10 N. E. Rep. 522, the testator had made a previous will, and had requested the draughtsman to make some changes in it, and to bring a new will. This was done. The testatrix signed it in the presence of the witnesses. The draughtsman then offered to read it to her, and she declined, stating that he could do it some other time, and requested him to keep it in his custody, and it remained with him until her death; she never having read it, nor was it ever read to her. The will was admitted to probate. In Vernon v. Kirk, 30 Pa. St. 218, the court held that when the execution had been proved the law raised the presumption, affirmatively, that the testatrix knew the contents of the paper, the presumption being drawn from the ordinary conduct of mankind; that men did not ordinarily sign papers without a knowledge of what is embraced within them; and this is true alike of men who can read, and those who cannot. But when fraud appears, and undue influence is charged and proved, affirmative proof of the knowledge of the contents of the paper set up as the will may be necessary, but in no other case; and the cases in which affirmative proof of the knowledge of the contents has been held essential, after the execution of a paper has been shown, are, almost without exception, those in which such proof has been needed as an answer to a charge of imposition upon the testator.

Under the principles of law thus laid down, I must hold, presumptively, and without reference to the extrinsic evidence which I shall hereafter advert to, that Mrs. Hall knew the contents of the instrument at the time of its execution. But it is claimed by the contestant that this presumption is negatived by evidence of the existence of fraud and undue influence. This makes it necessary to consider the evidence adduced. Mrs. Hall was 71 years of age, and had been a widow for 10 years. She was by birth a Russian, but had been a long time away from her

native country. She spoke English and German very fluently, was educated, and was shown to have some critical knowledge of the literature of the German language. She had inherited or had acquired a considerable estate, which she had lost through bad investments made by her husband; but she died possessed of the leasehold property, No. 83 East Tenth street, and some securities contained in a safe-deposit box, the value of which has not been proven. She was childless, and, so far as appears, she left no next of kin. The successive testamentary instruments, as they have been disclosed on the trial, are important to consider in deciding the issue of fraud and undue influence. It appears that in 1889 she executed a will, the general scheme of which is like the paper under consideration, except that Ross. was not named as a legatee. In November, 1890, she executed another, in which Hurley, one of the contestants in this proceeding, was the principal beneficiary. To this, in October, 1892, she made a codicil, by which Hurley's beneficial interest was increased. The will and codicil, in which Hurley was the principal legatee, were offered for probate, but none of the documents was formally put in evidence. They were, however, referred to in the examination of the witnesses, and treated, at least as far as concerned the purpose for which they are now adverted to, as if before the court. A little over two months after the date of the codicil to Hurley she executed the paper now under consideration. Of equal importance are Mrs. Hall's declarations of a testamentary purpose. In the summer of 1892, and at different periods—one as late as five days before the execution of the paper propounded—she is shown to have made statements indicating dissatisfaction with Hurley, and even denying that she had made a will in his favor, and stating that if she had she did not know it. She said, however, that she had signed some paper, the nature of which she did not understand, and feared she had signed away her property to him, and she desired to know how it could be avoided. Two of the parties to whom she made such statements, in the summer of 1892, were Mr. Vose, an officer of a safe-deposit company, and Mrs. Win-

ston, an old friend.   In August, 1892, she stated to Mr. Force, the husband of one of the legatees of the residuary estate, as a secret, that Hurley had made indecent proposals to her, and had held that fact over her as a threat.   Yet, in September or October, Force states that Mrs. Hall told him that she had made a will leaving her property to Hurley and her housekeeper.   Then, prior to Thanksgiving day (which was after the execution of the codicil to the Hurley will), she told him that Hurley had dogged her into signing the will, that she wanted to break it, and that she had been to some bank or safe-deposit company to see about it.   She further said she did not want Hurley to have any of her property, and would go home and make a new will. These declarations indicate a change in the feeling she had entertained for Hurley which would sufficiently account for her determination to revoke the instrument by which he was to be benefited.   Nearly coincident with these expressions of dissatisfaction with Hurley were declarations of Mrs. Hall of a purpose to provide for the nieces of her husband.   Later, in 1892, she had begun to tire of the cares of her house, and asked the husbands of two nieces to take it, and each declined.   In November she began a negotiation with Ross, the husband of another, to that end; and a lease was executed by Mrs. Hall to him, which was superseded by another that went into effect December 1st, and a few days after Mrs. Ross removed to the house, her husband having been in possession from the 1st.   Early in December Mrs. Hall's severe illness began.   Then followed events which resulted in a new will—the one now in contest.   Mrs. Hall had become acquainted with Heermance, the proponent, through an introduction by Ross.   It appears from the testimony of Bucher that the engrossed will, as it now is, with the exception of the last sheet, was produced and read to Mrs. Hall on the night of the 15th of December, when Dr. Sheppard and Bucher, two of the subscribing witnesses, and a Miss Caughey, were present; but, as stated by Bucher, in the reading of the paper, the name of a legatee on the last sheet was wrongly read, the decedent understanding that the bequest of a share of the

residuary estate was given to Mr. Buckle, insteaa ot to his wife, she, the testatrix, under this impression, tore the sheet. This necessitated the re-engrossment of that sheet, and for that purpose it was given to Heermance, who was in the parlor below. Dr. Sheppard did not testify to the reading of the will. On the same evening another paper, declaratory of Mrs. Hall's feelings towards Hurley, came into being. It probably followed the reading and the mutilation of the last sheet of the will. As the will could not be executed, she asked those present to be witnesses to her statement that the will executed in favor of Hurley was wrong. Bucher suggested that such a statement should be in writing, and Miss Caughey wrote on the back of a blank billhead of Mrs. Hall's the words: "The will made out to J. C. Hurley is all wrong, and I hereby certify to that fact this 15th day of December, 1892, in the presence of witnesses." At the end of this writing she wrote her signature, and Dr. Sheppard, Mr. Bucher and Miss Caughey attested it as witnesses. It does not certainly appear that the reading and tearing of the will preceded the signing of the memorandum which she supposed amounted to a revocation of the will in favor of Hurley, but it is a reasonable inference that such was the order of the two acts from the fact that both documents were there on that night. Miss Caughey was not examined as a witness, as she had gone to Europe, and could not be produced. Hence, I must determine the fact in the light of the testimony of Bucher, with such support as the circumstances of the case afford. He has shown extraordinary lapses of memory, to say the least, in respect of dates and events. This is also true of Dr. Sheppard; and each, by a very unusual coincidence, in his first examination, did not refer to the events that took place on the night of the 15th, when it was claimed that the engrossed will was torn, and the paper written by Miss Caughey was signed by the decedent and witnesses. Dr. Sheppard and Bucher had no abiding interest in this case to prompt their memories in respect to matters collateral to the execution of the will. With one near 70 years old, and the other over 60, it was not to be expected that either, in

the midst of a severe and searching cross-examination conducted by able counsel, would or could at once recall every event connected with matters prior to the execution which might be a matter of primary importance.    As Dr. Sheppard states that he made no memorandum of the medical history of the case, by which he could fix dates, but depended upon his unaided recollection to recall its features, he would not be apt to take any greater precaution in a matter not connected with his professional duties.    In respect to the execution, his memory had to be jogged before he recalled one important point that he did not at first state—the request by Mrs. Hall for the witnesses to sign the paper.    Bucher, however, if he is to be believed, had data in his memorandum book to which he was able to refer after his first day's examination, and thus correct the dates of certain events, and (of his own motion) he made the corrections.    The attention of neither had been drawn in his examination to the events that took place prior to the execution.    Bucher, late in the trial, testified that he did not state the facts of the reading of the will, and the destruction of the last sheet, and the signing of the paper declaring the will to Hurley "all wrong," because he was not asked.    There is nothing improbable in the explanation, coming, as it does, from a disinterested witness.    No effort was made to impeach the credibility of Sheppard or Bucher, except by certain self-contradictions and inconsistent statements made by them, and their failure to recall at least one fact of special importance—the reading of the will on the night of the 15th.    There is no suggestion that each is not a reputable citizen.    While I believe that when Heermance first took the stand he made his testimony to fit the dates testified to by Dr. Sheppard in respect to Mrs. Hall's illness, and the changes which took place, and make it harmonize with Dr. Sheppard's narrative of Mrs. Hall's condition, I do not think that Dr. Sheppard and Bucher recast their testimony, as claimed by contestants' counsel, to suit the exigencies of the case raised by the later statements of Heermance.    As their uncontradicted evidence is consistent with Mrs. Hall's declarations of a testamentary pur-

pose, testified to by Mrs. Bernard and her daughter, and by Mrs. Winston, and with the provisions in the will of 1889, and with a changed state of feeling towards Hurley, and inconsistent with any other theory, I am led to the conclusion that on the night of December 15 she did hear the will read, as stated by Bucher, and that, as testified to by Smith, the engrosser, it was the identical paper now under consideration, except the last sheet, which contained the same language as was used in the re-engrossment. In addition to this, at the time of the execution, she declared, in the presence of the witnesses, that she knew the contents of the will. With these facts proven, I need not rely on the legal presumption of knowledge by her of the contents of the will, if she was at the time of sound mind.

Mrs. Hall's mental condition on the night of the 20th of December thus becomes a question of the first importance. I will first consider whether the contestants have adduced affirmative proofs to overcome the testimony of the subscribing witnesses. On that occasion, Mrs. Hall made the simple response, "Yes," to the questions put to her respecting the execution of the will. Such response, in connection with the questions, constituted a sufficient declaration of the character of the paper, and a sufficient request for the witnesses to attest it. Each of the subscribing witnesses, when first examined, had not heard the testimony of the others. I was very favorably impressed with the testimony of the young man Eberts. He had come to reside in the house on the 15th of December, the very day on which the memorandum written by Miss Caughey was signed, and he seems to have been asked to be a witness because of his accidental presence on that occasion. He states that he had heard nothing about the execution of a will until that evening. No attempt has been made to impeach his testimony, and the only fact that would suggest a possible bias is that he was a friend of Ross, one of the legatees. If there was a conspiracy, as claimed by the contestants, the conspirators would not be likely to take in a young man just of age, a stranger to some, and only a recent acquaintance of others, except Ross. He was the first

witness, and his testimony was apparently ingenuously given. Against his evidence is the testimony of Mary Bristol, a woman who was employed in the house as a domestic from the 16th to the 20th of December, during which time she admitted that she saw Mrs. Hall but twice, and during the residue of the month was more or less in attendance upon her until January 1st, when she became her nurse; of Hopkins, a man who attended upon her five days from the 17th to the 23rd day of December, when he was discharged; of Johnson, another man, who did odd jobs about the house before and after the date of the will; and of Dr. Vedder, who was called in by an acquaintance of Mrs. Hall's on the 17th of December, and testified that he found her unable to answer his questions.   He says he stayed not more than 15 minutes, and others say that he was there as long as that.  There is no doubt that, some time during December, Mrs. Hall was in such a state of unconsciousness, for a period of a few days, that Dr. Sheppard pronounced it coma.   He first fixed the period as between the 11th and 15th of December, and later in the trial, when recalled, he corrected the dates, stating that on the 12th she had recovered from the stupor.   If, when she signed the will, she fully comprehended the business she was about to transact, and had in view the nature and extent of her possessions, and knew those who had claims upon her bounty, and acted of her own free will, it matters not what may have been her condition before or after.   It appears by the testimony that, early in January, Mrs. Hall had recovered from her serious illness, and was up and about the house, and even went below, to the dining room, to her meals.   She received those who called upon her, conversed with visitors and the inmates of the house, signed checks which were produced in evidence, and there is abundant proof that, until a few days before her death, her mind was generally unclouded.   I do not recall any evidence given that shows that the subject of her will was during that time referred to, but she must have known the fact that she had executed the paper, and, if it did not satisfy her, she had abundant opportunity to revoke it, or make another.   The uncontra-

dicted facts bearing upon the question of Mrs. Hall's mental condition, and her knowledge of the contents of the will, on the night of December 20th, are these: In 1889 she executed a will in favor of her husband's nieces, whom she held in high esteem, though they were not of kin to her. In 1890 she made another in favor of John C. Hurley, a stranger to her blood, and with no family connection. Beginning in the summer of 1892, her declarations show that Hurley had fallen into her disfavor. Nevertheless, in October of that year she executed a codicil by which the benefaction to him was increased. Later she stated that she had been dogged by Hurley into making a will for him, and continued thereafter to reiterate her purpose to care for her husband's nieces. Early in December she became seriously ill, and some time during the month—probably the first half—for a period of a few days she was more or less unconscious. On the evening of the 15th a paper was produced to her, purporting to be a will, which, it is claimed, on the testimony of one witness, was read to her in his presence, and in the presence of two others; that she on that occasion tore the last leaf, because of a fancied misstatement of her wish as to one beneficiary named in the residuary clause, which made it impossible to execute the paper that night; that she then asked those present to be witnesses to her statement that the will to Hurley was all wrong, and on the suggestion of one of them a paper was written, stating what she had said. To this she wrote her name, and the signatures of Dr. Sheppard, Mr. Bucher, and Miss Caughey, a friend of Mrs. Hall's, now absent in Europe, attest it as witnesses. On a subsequent evening she spoke to Eberts of her gratitude to Ross for his kindness to her, and stated that he should be paid for it. On the night of the 20th, according to the uncontradicted testimony of Eberts, he and the other subscribing witnesses, Dr. Sheppard and Bucher, went to Mrs. Hall's room, where they found her in bed, with the will under consideration in her possession, it not being claimed that she had then had it more than a few minutes. The formalities of execution were gone through with. Mrs. Hall's signature shows a deteriora-

tion from that made on the paper signed on the evening of the 15th, and it is conceded that Bucher held her hand and assisted her in making it. Eberts testified that on that occasion Mrs. Hall was as bright as he had usually seen her on the preceding evenings when he was with her in her sickness, and that she appeared to be of sound mind, and acted free from restraint. When the paper was produced for probate it was found to conform in every respect to her previously expressed declaration of a purpose to provide for the nieces and for Ross, he and his wife having cared for her from early in December to the date of the will. On these facts, either conceded or testified to by Eberts, who was a stranger to all the parties, if she was of sound mind, the presumption is raised that she knew the contents of the paper at the time of its execution, and that it reflected her wishes. It was incumbent upon the contestants to overcome the case thus made in favor of the will. I was greatly impressed with the argument of the learned counsel for the contestants, and, after reading the volume of testimony, I read his argument again with equal interest. But, after a careful consideration of the whole case, I am compelled to decide that the contestants have not sustained their allegations. The interest of Ross, Mrs. Ross, Mrs. Buckle and Mrs. Force was such that the testimony they gave may have been biased, but Dr. Sheppard and Bucher confirmed the testimony of Eberts in respect to the facts that occurred on the night of the execution of the will. No attempt by extrinsic evidence has been made to contradict their statements. On full consideration I am satisfied that their testimony is true, in respect to the essential facts necessary to establish a will, and that the formalities of the statute have been complied with, and that the paper is entitled to probate. A decree may be presented accordingly.